**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| In re:<br><br>Massa Falida de Mappin Lojas de Departamento S.A.,<br><br>        Debtor in a Foreign Proceeding | Case No. 16-_____ (Chapter 15) |
| In re:<br><br>Mappin Telecomuniçães Ltda.,<br><br>        Debtor in a Foreign Proceeding | Case No. 16-_____ (Chapter 15) |
| In re:<br><br>Casa Anglo Brasileira S.A.,<br><br>        Debtor in a Foreign Proceeding | Case No. 16-_____ (Chapter 15) |

**DECLARATION OF FOREIGN REPRESENTATIVE AND STATEMENT PURSUANT TO 11 U.S.C. § 1515(c) AND FED. R. BANKR. P. 1007(a)(4)(B)**

I, Afonso Henrique Alves Braga, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.      I am a Brazilian attorney, licensed to practice and registered before the Brazilian BAR (OAB/SP) No. 122.093, working mainly with Reorganization and Bankruptcy judicial procedures.  I maintain my offices at Avenida Nove de Julho, 3.239, São Paulo/SP, Brazil.

2.      I am the court-appointed trustee responsible for foreign asset recovery and duly-authorized foreign representative of the Brazilian proceeding (the "Brazilian Proceeding") of the above-captioned debtors, Massa Falida de Mappin Lojas de Departamento S.A. ("Mappin Lojas"), Mappin Telecomunicações Ltda., and Casa Anglo Brasileira S.A. ("Casa Anglo")

1

(together, the "<u>Debtors</u>"), pending before the Court of Justice of the State of São Paulo, Central Civil Court, 18th Civil Division (the "<u>Brazilian Bankruptcy Court</u>") pursuant to Brazilian Bankruptcy Decree-Law, number 7.661 of 1945 (the "<u>Brazilian Bankruptcy Law</u>") under the laws of the Federative Republic of Brazil ("<u>Brazil</u>").

3.      To ensure that my testimony is accurately expressed in the English language and in order to ensure that I understand fully the language used in this declaration, I reviewed a Portuguese language version of this statement for completeness, which was presented by one of my Brazilian Lawyers, Dr. Henrique Forssell which is a native Portuguese speaker and is fluent in English.

4.      I make this Declaration, solely in my capacity as the court-appointed trustee responsible for foreign asset recovery and duly-authorized foreign representative of the Brazilian Proceeding, based on my personal knowledge of the facts involved and upon my review of the books and records customarily kept and maintained by the Debtors.

5.      In compliance with section 1515 Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "<u>Bankruptcy Code</u>") and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), I hereby respectfully submit this Declaration in support of the form and written memorandum chapter 15 petition (together, the "<u>Chapter 15 Petition</u>") filed at my direction contemporaneously herewith requesting entry of an order recognizing the Brazilian Proceeding as a foreign main proceeding pursuant to section 1517 of and granting certain related relief pursuant to sections 105(a), 1509(b), 1520, 1521, 1525 and 1527 of the Bankruptcy Code.  In addition, I hereby also submit this Declaration in support of an adversary proceeding (the "<u>Verified Complaint</u>") commenced pursuant to Rules 7001(1) and (7) of the Bankruptcy Procedure Rules and 11 U.S.C. §§ 105, 541, 542, 1519(a)&(e), 1521(a)&(e),

and applicable law. The adversary proceeding arises in and relates to the above-captioned Chapter 15 petition and seeks urgent and critical pre- and post-recognition relief necessary to preserve and recover assets that I have a right to recover for the benefit of the Debtors' Estate and their creditors.

6.    This Declaration sets forth a description of the Debtors' former business operations and indebtedness, the circumstances leading to the commencement of the Brazilian Proceeding, the relevant material developments in the Brazilian Proceeding leading to the commencement of the chapter 15 case and the adversary complaint, and the factual bases for the relief requested in the Verified Chapter 15 Petitions and Verified Adversary Complaint.

## I.    RELEVANT FACTS

### A.    Corporate History Of Debtors

7.    The Mappin chain of department stores was founded in 1774 in England.  On November 29, 1913, two brothers, Walter and Herbert Mappin, opened the first Mappin department store in Brazil.

8.    In 1990, Mappin Lojas became incorporated in Brazil, with its headquarters in São Paulo, Brazil, and began to operate the Mappin chain of department stores.  The Mappin department stores quickly became known as one of the most popular department store chains in Brazil.

9.    In October 1996, Mansur, a Brazilian businessman and bank owner, acquired Mappin Lojas and became its CEO.  At that time, Mappin Lojas had approximately 9.000 employees and annual sales in excess of 1 billion Reais per year (approx. US$ 300,000,000.00).

10.    Mappin Telecomunicações is an affiliate of Mappin Lojas.

11.     Mansur indirectly owns Mappin Lojas and Mappin Telecomunicações through Casa Anglo.

**B.     Events Precipitating Commencement Of Brazilian Proceeding**

12.     In or around 1999, Mappin Lojas began to fail paying its debts as they fell due. The Debtors' fall into financial distress and eventually insolvency was widely suspected to have been the result of a fraud perpetrated by Mansur and others, as evidenced by considerable Brazilian press coverage to that effect at that time.

13.     These developments prompted a large number of creditors to petition for Mappin Lojas to be declared bankrupt and placed into insolvency proceedings.

**C.     Commencement of Brazilian Proceeding**

14.     By order dated July 29, 1999, issued by the Brazilian Court, Mappin Lojas was placed into a formal Brazilian insolvency process pursuant to Brazilian Bankruptcy Law under the laws of Brazil.

15.     Subsequently, on March 23, 2000, the bankruptcy was extended to Mappin Telecomunicações and Casa Anglo.

16.     After Mappin Lojas was declared bankrupt, the press reported that Mr. Mansur had fled to the UK.

17.     Initially, Dr. Alexandre Alberto Carmona was appointed as the trustee in bankruptcy. He was later replaced by Dr. Nelson Carmona, who is presently the trustee responsible for the collection of assets located in Brazil.

18.     Then, on March 16, 2010, I was appointed as a trustee in bankruptcy responsible for the collection of assets internationally.

4

19.     Under Brazilian law, the role of Dr. Carmona and my role are distinct and they operate independently. Dr. Carmona is responsible for the recovery of Brazilian assets, whereas I am responsible for the recovery of assets internationally.

**D.     The Brazilian Court Holds Mansur Personally Liable for the Debts of the Debtors and Includes His Assets within the Brazilian Liquidation Estate**

20.     After extensive investigation, and based on among other evidence, a report from the Central Bank, I concluded that Mansur had fraudulently misapplied assets.  This conclusion was corroborated by contemporaneous press coverage reporting that Mansur was a fraudster.

21.     As a result, on July 6, 2011, I applied to the Brazilian Court for an *ex parte* order, for among other relief, to pierce the corporate veil of the Debtors to hold Mansur and his assets personally liable for the debts of the Debtors pursuant to Article 50 of Law number 10.406, dated of 2.002, as amended (the "Brazilian Civil Code").  I also requested the Brazilian Court to reverse pierce the corporate veil of other, non-debtor entities owned and controlled by Mansur so that those assets would also be subject of the bankruptcy.

22.     My application was granted by the Brazilian Court on August 6, 2011.  The Brazilian Court entered an *ex parte* order that pierced the corporate veil of the Debtors, extended the bankruptcy to Mansur, and made Mansur and his assets personally liable for the debts of the Debtors (the "Veil Piercing Order").  A true and correct copy of the Veil Piercing Order is attached hereto as **Exhibit A**.  Pursuant to the Veil Piercing Order, I am entitled to seize all assets that are owned (nominally, beneficially, equitably, or otherwise) by Mansur. The order also granted my request for reverse veil piercing, and extended the bankruptcy to various, non-debtor entities owned and controlled by Mansur.

23.     On August 24, 2011, Mansur was duly served with the August 6, 2011 Veil Piercing Order.

24.     The various entities owned and controlled by Mansur that were made subject to the August 6, 2011 Veil Piercing Order appealed, and the Tribunal de Justiça de São Paulo (the "São Paulo Court of Appeals") allowed them to defend against the application for reverse veil piercing on an *inter partes* basis before the Brazilian Court.

25.     Mansur in his individual capacity, however, although given notice of order, chose not to appeal the Brazilian Court's decision in its August 6, 2011 Veil Piercing Order to pierce the corporate veil of the Debtors and hold Mansur personally liable for the debts of the Debtors' estate.   Therefore, the August 6, 2011 Veil Piercing Order is enforceable against Mansur personally and any assets that he owns, directly or indirectly, including through shares that he holds in any company.

26.     In addition, on December 16, 2014, I filed an application seeking  to obtain a certification that the decision that pierced the corporate veil of the Debtors is final and non-appealable, as well as clarification as to whether the August 6, 2011 Veil Piercing Order applied to Mansur, in his individual capacity.

27.     On January 15, 2015, the Brazilian Court confirmed that the August 6, 2011 Veil Piercing Order extended the bankruptcy to Mansur's personal assets, and that Mansur had failed to appeal that decision (the "January 15, 2015 Decision").   A true and correct copy of the January 15, 2015 Decision and English translation is attached hereto as **Exhibit B**.

28.     On December 9, 2015, Mansur took an interlocutory appeal of a November 24, 2015 order by the Brazilian Court that authorized the collection for the estate of Ricardo Mansur´s shares in Brazilian companies (the "November 24, 2015 Order").

29.     On June 17, 2016, the São Paulo Court of Appeals dismissed Mansur's interlocutory appeal (the "June 17, 2016 Appellate Order").   A true and correct copy of the June

17, 2016 Appellate Order and English translation is attached hereto as **Exhibit C**. Therein, the São Paulo Court of Appeals confirmed, yet again, that Mansur's assets are subject to the Brazilian Proceeding. *See id.* Specifically, the São Paulo Court of Appeals confirmed that: "there is a final and non-appealable decision to impinge Ricardo Mansur's estate," and "Ricardo Mansur, the shareholder should respond with his assets to the debts incurred due to the bankruptcy of the Mappin group." *See id.*

30.     Subsequently, Mansur has made a *recurso especial* or "special appeal" of the June 17, 2016 Appellate Order to the Brazilian Superior Court of Justice, which remains pending as of the date hereof.  As a result, the November 24, 2015 Order is not yet final.  The August 11, 2011 Veil Piercing Order and January 15, 2015 Decision are final under Brazilian law, however, and the authorization they provide for me to collect Mansur's assets outside of Brazil has not been impacted by the pendency of this special appeal.

**E.     Despite the Demise of the Debtors, Mansur Continues to Maintain an Extravagant Lifestyle Through Strategic Asset Planning and Multiple Relocations to Avoid Enforcement of His Liability to Mappin Creditors in the Brazilian Proceeding**

31.     Despite being the majority shareholder and CEO of a company that had thrived for nearly a century in Brazil, only to become woefully insolvent after three years of his ownership and control, Mansur has continued to maintain a lavish lifestyle following the Debtors' demise.

32.     A sophisticated and worldly businessman, my investigation has revealed that Mansur has a demonstrated history of using strategic asset protection tactics with the purpose and effect of hiding his assets by through the use of straw men or "*laranjas*" (oranges), as they are called in Brazil (*i.e.*, individuals who nominally own assets on Mansur's behalf and defer completely to his use and control thereof), or interposing into the chain of ownership one or

more intermediary corporate entities through which his ultimate beneficial ownership and control of corporate assets is maintained.

33.    According to court filings by Mansur's former wife, Patrícia Rollo Mansur, in their divorce proceeding, obtained by me through appropriate legal procedures as part of my investigation into Mansur, he used numerous companies to manage assets he owned and controlled away from the Debtors' bankruptcy proceeding.  In the public records, Mansur did not own these companies.  Instead, they were purportedly owned by Mansur's accountant, his personal trainer, and his gardener.  These straw men (or *laranjas*), however, frequently appointed Mansur as the companies' attorney-in-fact with broad powers to act on their behalf.  To date, there is evidence that Mansur used upwards of thirty of these companies[1] to manage assets away from the Debtors' estate.

34.    In addition, Mansur has demonstrated a pattern of evading his responsibility to the Debtors' creditors by moving himself and his assets from jurisdiction to jurisdiction.

---

[1] Bankplus Administração de Bens e Participações Ltda.; Bankplus Factoring Fomento Comercial Ltda.; Premiere Editora e Promoções Ltda.; Info Refill Assistência Técnica e Comércio de Informática Ltda.; Madertuba Comércio de Madeiras Ltda.; Telemercantil Comércio de Equipamentos e de Artigos de Uso Doméstico Ltda.; Investcorp Financial Administração de Bens e Participações Ltda.; Society Tours Participações; Comércio e Turismo Ltda.; Mercantil Brasileira de Comércio Eletrônico Ltda.; Viva Financial Administração de Bens e Leilões Ltda.; SINGRA – Soluções Integradas de Gestão e Recuperação de Ativos Ltda.; SHF Holdings Ltda.; Volpi Imóveis e Participações Ltda.; Ophera Participações, Comércio de Equipamentos e Artigos de Uso Doméstico Ltda.; Axminster Consulting Inc; Sun North Motors Ltda. and Maclevi Administração de Bens Ltda.; Cibramar Comércio e Indústria Ltda.; Cibramar, Savena União de Revendedores de Veículos Ltda.; Alltrade Comércio Exterior; Presta Administração de Cartões de Crédito; Odejan Participações Ltda.; H.I.C. Hermann Beteiligunsgsgesellschaft M.D.B. do Brasil Ltda.; Pauliscar Distribuidora de Veículos; Cibramar Caminhões Ltda.; Comercial Cibramar Ltda.; Cibramar Imports Santo André Ltda.; Consórcio M Ltda.; and FlexPlan Securitizadora de Créditos Financeiros S.A.  This list is non-exhaustive.

35.     Following the commencement of the Brazilian Proceeding, Mansur relocated to London, England, where he continued to lead an abundant lifestyle, which included living in a multi-million dollar house in Kensington and maintaining a polo center.

36.     After investigation, I concluded that, many years after the Debtors entered bankruptcy, Mansur relocated to or otherwise maintained a presence in Brazil in or around 2009 and 2010.  He and his second wife rented a house in the most expensive condominium in the countryside of São Paulo and were members in one of the most exclusive clubs in Ribeirão Preto.  Such a conclusion was corroborated by contemporaneous press coverage.

37.     Most recently, Mansur once again moved himself and his assets from London to Miami Beach, Florida, shortly before I obtained orders from the Chancery Division of the English High Court (the "UK Court") that enabled me to commence an asset recovery campaign against Mansur in the UK.

**F.     After I Commenced a Recognition Proceeding in the United Kingdom, Mansur Moves and Transfers His Business Activities to Miami Beach Where He Currently Maintains a Lavish Lifestyle**

38.     On August 12, 2011, following shortly upon the issuance of the August 6, 2011 Veil Piercing Order, the Brazilian Court issued an order authorizing me to take action abroad to identify and retrieve the assets of the Debtors' estate.

39.     On May 14, 2015, based on information that Mansur was living and maintained a substantial asset presence in London, United Kingdom, I applied to the UK Court to open proceedings (the "UK Ancillary Proceeding") to have the Brazilian Proceeding recognized under Article 15 of the UNCITRAL Model Law on Cross-Border Insolvency as adopted into UK law in Schedule 1 to the Cross-Border Insolvency Regulations 2006 (the "CBIR").  I also sought an order to entrust me the administration, realization and distribution of Debtors' assets located in the UK, as provided for in Articles 21(1)(e) and 21(2) of the CBIR.

40.     On July 6, 2015, the UK Court recognized the Brazilian Proceeding under Articles 15 and 17 of the CBIR, and entrusted me with the administration, realization and distribution of the Debtors' assets located in the UK pursuant to Articles 21(1)(e) and 21(2) of the CBIR.  Notably, this relief is substantially the same relief as in the UK, among other relief, in the Verified Complaint.

41.     In the wake of the UK Court recognizing the Brazilian Proceeding and entrusting me with the distribution of the Debtors' assets located in the UK, Mansur since has relocated to Miami Beach, Florida where, upon information and belief, he has continued his lavish lifestyle.

**G.    Mansur's Lifestyle and Known Assets In Miami Beach Suggest He Has Additional Assets Located in the United States Within His Possession, Custody or Control, Which I Have a Right to Recover for the Benefit of the Debtors' Estate and Their Creditors**

42.     According to Mansur's LinkedIn page, he resides in Miami Beach, Florida, is an as "angel investor," and holds several real estate development interests in the United States.  A true and correct copy of a screen capture of Mansur's LinkedIn page from November 3, 2011 is attached hereto as **Exhibit D**.

43.     Previously, upon information and belief, Mansur was renting a penthouse in the luxury condominium building, Bal Harbour Tower.

44.     Upon information and belief, Mansur currently resides in a 6,000-plus square foot, seven-bedroom mansion on 5185 North Bay Road in Miami Beach, Florida.  Based on publicly available information, the mansion is estimated to be worth almost US $6 million, and rents for approximately US$35,000 per month.

45.     Mansur's name has also been associated with two other properties in this District: a condominium located on Collins Avenue and a business office at Kane Concourse, both in Miami.

46.     As reported in public filings with the Florida Secretary of State, Mansur is an authorized representative (either manager and/or managing member) of four Florida limited liability companies:  Florida Royal Distributions, LLC; Society Retail & Auction, LLC; King Royal Properties, LLC; and Unico Asphalt, LLC (together, the "Florida LLCs").  True and correct copies of the Florida LLCs' 2016 filings with the Florida Secretary of State are attached hereto as **Exhibit E**.

47.     Society Retail & Auction, LLC has a similar name to entities that are known to be controlled by Mansur in Brazil. For instance, Society Tours Participações translates to "Society Tours Partnership," and Viva Financial Administração de Bens e Leilões Ltda. translates to "Viva Financial Asset Management and Auctions Ltd."

48.     Each of the Florida LLCs lists its principal address as 5185 North Bay Road in Miami Beach, Florida, which is believed to be Mansur's residence.

49.     Pursuant to the Veil Piercing Order, I am entitled to apply for the seizure of Mansur's ownership in the Florida LLCs, as well as assets that are owned by the Florida LLCs for which Mansur is the beneficial or equitable owner, for the benefit of the Debtors' Estate.

50.     To date, I am aware that one of the Florida LLCs, Society Retail & Auction, LLC, has or has had at least fifteen luxury vehicles registered under its name (together, the "Luxury Vehicles"). The following is a list of the Luxury Vehicles and a brief description of public estimates of their current market value:

- 2014 blue **Rolls-Royce Wraith** (VIN: SCA665C51EUX84466), which, according to Kelley's Blue Book Official Guide ("KBB"), has a $300,000 estimated at-purchase market value;

- 2014 silver **Rolls-Royce Wraith** (VIN: SCA665C58EUX84299), which, according to KBB, has a $300,000 estimated at-purchase market value;

- 2012 blue **Rolls-Royce Phantom** (VIN: SCA682D58CUX16704), which, according to The Car Connection ("<u>TCC</u>"), has a $380,000 estimated at-purchase market value for the base model;

- 2009 black **Rolls-Royce Phantom** (VIN: SCA3C67569UX32011), which, according to TCC, has a $340,000 estimated at-purchase market value for the base model;

- 2015 black **Bentley Continental** (VIN: SCBGJ3ZA2FC044844), which, according to the manufacturer's suggested retail price, is sold at $214,000;

- 2013 black **Bentley Continental** (VIN: SCBFR7ZA9DC078126), which, according to KBB, has a $200,000 estimated at-purchase market value;

- 2012 black **Bentley Continental GTC** (VIN: SCBGR3ZA3CC075217), which, according to KBB, has a $200,000 estimated at-purchase market value;

- 2015 white **Mercedes-Benz SL65 AMG** (VIN: WDDJK7KA2FF030898), which, according to the manufacturer's suggested retail price, is sold at $221,000;

- 2015 white **Mercedes-Benz S63 AMG** (VIN: WDDXJ7JB4FA005053), which, according to the manufacturer's suggested retail price, is sold at $157,400;

- 2014 silver **Mercedes-Benz S550** (VIN: WDDUG8CB6EA008460), which, according to KBB, has a $100,000 estimated at-purchase market value;

- 2014 black **Mercedes-Benz SLS Coupe** (VIN: WDDRJ7JA7EA010374), which, according to KBB, has a $200,000 estimated at-purchase market value;

- 2013 black **Mercedes-Benz SL63 AMG** (VIN: WDDJK7EA0DF011890), which, according to Car and Driver Magazine, has a $147,000 estimated at-purchase market value for the base model;

- 2011 black **Mercedes-Benz E3504M** (VIN: WDDHH8HB3BA383144), which, according to Car and Driver Magazine, has a $57,000 estimated base price value;

- 2012 silver **Aston Martin Virage Volante** (VIN: SCFFDEDN9CGH13478), which, according to Car and Driver Magazine, has a $211,600 estimated at-purchase market value for the base model; and

- 2016 black **Cadillac Escalade** (VIN: 1GYS3AKJ6GR167944), which, according to Car and Driver Magazine, has a $74,000 estimated at-purchase market value for the base model.

True and correct copies of the ownership records for the Luxury Vehicles are attached hereto as

**Exhibit F**.

12

**H.  Current Status of Brazilian Proceeding**

51.     Based on the last report from Dr. Carmona, the court-appointed trustee responsible for the local asset recovery in Brazil, dated as of January, 28, 2016, at least 1092 claims against Mappin have been admitted to proof in the sum of R$ 361,538,176.94 (approximately US$109,226,035.33).  Of this sum, R$51,123,805.85 ≅ US$15,445,258.56 of the total debt was already paid by the estate, leaving a balance of R$310,414,371.09 (approximately US$93,780,776.76) yet to be paid. The total amount of the unpaid debt can be divided into 4 categories: i) labor related debts (R$ 10,203,777.86, approximately US$3,082,712.34) which have preferential status under Brazilian law; ii) tax related debts (R$ 46,149,711.18 approximately US$13,942,510.93) also with preferential status; iii) privileged debts (R$ 5,256,965.42 approximately US$1,588,207.08); and iv) unsecured debts (R$ 248,800,593.11 approximately US$75,166,342.33).  Mr. Carmona is still considering claims which have been made by other ordinary unsecured creditors of Mappin.  In addition, Mr. Carmona has been considering the claims submitted by the Brazilian tax authorities.  Such claims, if admitted, will have preferential status.  At a minimum, these are worth R$350,000,000.00 (approximately US$105,740,181.27).  The total of the estimated debts of Mappin are, at a minimum, therefore, approximately R$700,000,000.00 (approximately US$211,480,000.00).  The value of the assets of Mappin collected by the Trustees in Bankruptcy to date is approximately R$131.123.805,85 (approximately US$39.614.442,85).

52.     As such, the total of the estimated debts of the Debtors are, at a minimum, approximately R$380,000,000.00 (approximately US$114,803,625.38).  By contrast, the value of the assets of the Debtors collected by the Trustees in Bankruptcy to date is approximately R$131.123.805,85 (approximately US$39.614.442,85).

53.    The prospect of any further substantial recovery becoming available to the Debtors' creditors is largely dependent upon finding and retrieving valuable assets outside of Brazil that I have the right to recover for the benefit of the Debtors' Estate and their creditors.

54.    To that end, the value I will be able to realize post-recognition on behalf of the Debtors' creditors and Brazilian liquidation estate is highly dependent upon preventing Mansur from transferring assets in this District outside of the territorial jurisdiction of the United States following notice of these proceedings.

55.    Unfortunately, Mansur has demonstrated a pattern of evading his responsibility to the Debtors' creditors by moving himself and his assets from jurisdiction to jurisdiction, including most recently when he relocated to Miami Beach, Florida from the UK in time to frustrate execution of orders obtained by me from the High Court of England and Wales to seize his assets in the UK.  Moreover, my investigation indicates Mansur has engaged in strategic asset protection tactics with the effect and perhaps the purpose of hiding his ownership of assets nominally owned by limited liability companies over which he maintains ultimate beneficial ownership or control.

56.    Accordingly, I am seeking pre- and post-recognition relief entrusting me with the administration and realization of all assets of the Debtors located in the United States and suspending the right of Mansur or anyone else to transfer, encumber or otherwise dispose of any such assets pursuant to sections 1519(a)(2) and 1521(a)(3) (made available on a pre-recognition basis via section 1519(a)(3)) of the Bankruptcy Code.

57.    As a basis to suspend Mansur's right to transfer, encumber or otherwise dispose of any such assets, I am asking this Court to recognize and enforce the Brazilian Court's Veil Piercing Order, and confirm that all assets within the territorial jurisdiction of the United States

that are owned (nominally, beneficially, equitably, or otherwise) by Mansur are "assets of the debtor" that can and should be entrusted to Plaintiff for the benefit of the Debtors' Brazilian liquidation estate.

58.    I appreciate that the relief requested by the Chapter 15 Petition and Verified Complaint is multifaceted, but it all goes to the same end: to finally hold Mansur responsible for his actions and the injuries they have caused to the Debtors' creditors.

**I.    The Debtors' Only Known Assets in the United States are Located in this District**

59.    Mansur, whose assets have been consolidated into the Mappin Lojas' bankruptcy estate, is residing in this District and all of the assets I have been able to identify as of the date of this Declaration are kept by Mansur in this District as well.

60.    Additionally, I have deposited funds belonging to the Debtors' Estate in an escrow account maintained by Kobre & Kim LLP at Citibank, N.A. in Miami, Florida (the "Escrow Account").  The Debtors' Estate retains full ownership of the funds in the Escrow Account unless and until they are released at my direction.

61.    I also anticipate that through recognition of the Brazilian Proceeding and the exercise of discovery powers requested in the Chapter 15 Petition and in the Verified Adversary Complaint, I will be able to identify additional assets and/or causes of action belonging to the Debtors and their Brazilian bankruptcy estates (including, without limitation, currently unknown assets in the name or under the beneficial ownership or control of Mansur) located in the territorial jurisdiction of the United States.

62.    To the best of my information and belief, as of the date hereof, the Debtors have no employees or operations in the United States; nor are the Debtors party to any lawsuits in the United States.  The Debtors' only known property of value in the United States, and therefore its

principal assets, are the claims against and assets of Mansur and the funds held in the Escrow Account located in this District.

### J.  The Brazilian Proceeding Is a Foreign Main Proceeding

63.     I believe the Brazilian Proceeding fits squarely within the Bankruptcy Code's definition of a "foreign proceeding."  Insolvency proceedings in Brazil are governed by the Brazilian Bankruptcy Law.   Insolvency proceedings in Brazil are governed by Brazilian Bankruptcy Law.  Once a proceeding is converted to liquidation, Brazilian Bankruptcy Law provides that officers and directors of the debtor company are no longer allowed to manage its affairs and the assets of the debtor are collected and sold by the judicial administrator under the continued supervision of the Brazilian Court.

64.     As noted above, the Brazilian Court commenced the Brazilian Bankruptcy Proceeding in 1999 as a formal insolvency process.  In 2010, the Brazilian Court appointed me as the Trustee.  Since then, I have continued to fulfill my obligations under Brazilian Bankruptcy Law and the supervision of the Brazilian Court to collect and liquidate the Debtors' assets.

65.     I believe the Brazilian Proceeding qualifies as a foreign main proceeding because the Debtors' center of main interests ("COMI") is in Brazil.

66.     At all times since it began operations in 1990, Mappin Lojas has been incorporated and headquartered in São Paulo, Brazil.

67.     In addition, Mappin Telecomunicações and Casa Anglo are all Brazilian entities, and, upon information and belief, are headquartered in Brazil.

68.     Moreover, the Brazilian Proceeding has been pending before the Brazilian Court for over 15 years now. During at time, I am not aware of any suggestion having been made by a

creditor or party in interest that the Debtors' center of main interest is anywhere other than Brazil.

### K.  I am a Proper Foreign Representative of the Brazilian Proceeding

69.    I am an individual who has been duly appointed by the Brazilian Bankruptcy Court to act as the Trustee of the Brazilian Proceeding responsible for collecting and liquidating the Debtors' assets under the continued supervision of the Brazilian Court.

### L.  Brazilian Proceeding and Brazilian Bankruptcy Law Provide Creditors and Other Parties in Interest with Due Process

70.    Pursuant to Brazilian Bankruptcy Law, the Brazilian Proceeding has provided (and continues to provide) creditors and other parties in interest with the notice and opportunities to participate and be heard that are consistent with concepts of due process under United States law and jurisprudence as I understand them.  Moreover, the Brazilian Proceeding has played out in a manner substantially similar to what I understand takes place in a chapter 7 case under the Bankruptcy Code, with a centralized process to assert and resolve claims against the estate and a court-appointed and supervised trustee (i.e., me) responsible for collecting and liquidating the Debtors' assets and making distributions to creditors.  In sum, the relief I have requested by the Chapter 15 Petition would effectively extend this liquidation process into the United States, ensuring that assets belonging to or absconded from the Debtor located within the territorial U.S. do not escape the reach of the Brazilian Proceeding and empowering me to employ the means of investigation and discovery that are afforded as of right to trustees in plenary U.S. bankruptcy cases.

## II.      Statement Pursuant to 11 U.S.C. § 1515 and Bankruptcy Rule 1007(a)(4)(B)

### A.  Identification of Foreign Proceedings Involving the Debtors

71.      There is only one foreign main proceeding with respect to any of the Debtors known to me, which is the Brazilian Proceeding.

72.      The Veil Piercing Order, attached here to as Exhibit A, establishes the existence of the Brazilian Proceeding and the identity of each of the three Debtors:  Mappin Lojas, Mappin Telecomunicações, and Casa Anglo.

73.      Debtor Mappin Lojas is also subject to the UK Ancillary Proceeding pending in the United Kingdom. In the UK Ancillary Proceeding, the UK Court has recognized that I am the duly authorized Foreign Representative of the Brazilian Proceeding.

74.      As of the date hereof, there are no other pending foreign proceedings, other than the Brazilian Proceeding and the in the UK Ancillary Proceeding.

75.      I am continuously analyzing whether commencing any such additional proceedings is in the best interests of the Debtors' bankruptcy estate and creditors.

76.      In the event any such additional proceedings are commenced, I will promptly notify the court in accordance with section 1518(2) of the Bankruptcy Code.


### B.  List of Names and Addresses of Persons Authorized to Administer Foreign Proceedings

77.      I am the only duly appointed Foreign Representative for the Brazilian Proceeding and individual authorized to administer foreign proceedings of the Estate of Debtors Mappin Lojas, Mappin Telecomunicações, and Casa Anglo.

78.      On March 10, 2010, the Brazilian Bankruptcy Court issued an order confirming that I had accepted the appointment as trustee of the Brazilian Proceedings (the "Trustee

Appointment Order"). A true and correct copy of the Trustee Appointment Order and English translation thereof are attached hereto as **Exhibit G**.

79. On January 26, 2015, the Brazilian Bankruptcy Court authorized me to commence ancillary proceedings in other countries as may be necessary for my investigation and recovery of assets of the Debtors' estate (the "Chapter 15 Authorization Order"). A true and correct copy of the Chapter 15 Authorization Order and English translation are attached hereto as **Exhibit H**.

80. My address for all purposes related to the Brazilian Proceeding is:

> Afonso Henrique Alves Braga
> Avenida Nove de Julho, 3.239
> São Paulo/SP, CEP 01407-000, Brazil

**C. List of all Parties to Litigation Pending in the U.S. in Which the Debtors are Parties**

81. To the best of my knowledge, as of the time of filing their Verified Adversary Complaint for Recognition, there is no litigation pending in the United States in which any of the Debtors are parties.

**D. List of all Entities Against Whom Provisional Relief is Sought**

82. Pursuant to 11 U.S.C. § 1519, provisional relief is being sought against the following individuals and entities:

a. Mappin Lojas

b. Mappin Telecomunicações

c. Casa Anglo

d. Ricardo Mansur

e. Roberta de Menezes e Arruda

f. Florida Royal Distributions, LLC

g. Society Retail & Auction, LLC

    h.   King Royal Properties, LLC

    i.    Unico Asphalt, LLC

    j.    Jorge L. Coelho

    k.   Jose Carlos Santos

    l.    Defendants Does 1-1000

# # #

## 28 U.S.C. § 1746 VERIFICATION

To ensure that my testimony is accurately expressed in the English language and in order to ensure that I understand fully the language used in this declaration, I reviewed a Portuguese language version of this statement for completeness, which was presented by one of my Brazilian Lawyers, Dr. Henrique Forssell, who is a native Portuguese speaker and is fluent in English. I verify under penalty of perjury under the laws of the United States of America that the facts and matters alleged and contained therein are true and correct.

Dated:  November 14, 2016
São Paulo, Brazil

_____
Afonso Henrique Alves Braga, solely in his capacity as duly-authorized foreign representative of the Brazilian proceeding of Massa Falida de Mappin Lojas de Departamento S.A., Mappin Telecomunicações, and Casa Anglo Brasileira